# EXHIBIT M

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK: PART 54
------------------------------------------------------------ x
SSC NY CORP., f/k/a SUNRISE SECURITIES
CORP.,                                     :  Index No. 655048/2016
                                           :
          Plaintiff,                       :  Motion Seq. No. 8
                                           :
    -against-                              :
                                           :  **AFFIRMATION OF NOAM BESDIN**
INVESHARE, INC.,                           :  **IN SUPPORT OF MOTION FOR**
                                           :  **DEFAULT JUDGMENT**
          Defendant.                       :
------------------------------------------------------------ x

   NOAM BESDIN, an attorney duly admitted to practice in the Courts of this State, affirms the truth of the following under penalty of perjury:

   1.   I am an attorney at Amini LLC, counsel for plaintiff Sunrise Securities Corp. ("Sunrise") in the above-captioned matter. I submit this Affirmation in support of Sunrise's Motion for Default Judgment pursuant to CPLR §3215(a) (the "Motion") against Defendant Inveshare, Inc. ("Inveshare"). I have personal knowledge of the facts and circumstances as set forth below.

## FACTUAL BACKGROUND

   2.   As the Court is by now familiar with the facts and circumstances of this action, I will limit this discussion to those facts pertinent to this Motion.

   3.   Sunrise initiated this action on September 22, 2016, alleging Inveshare's breach of a Placement Agreement dated November 3, 2011 (the "Agreement"), pursuant to which Sunrise had been engaged by Inveshare to "on a reasonable best efforts basis, provide Inveshare with introductions to potential third party investors." Doc. No. 162 at p. 1. Inveshare's CEO, Davidi Gilo, confirmed at his deposition that the purpose of the Agreement was for Sunrise to "find investors that will purchase securities." Doc. No. 161 at 84:24-85:3.

4. The Agreement provides that in addition to a one-time non-refundable $60,000 retainer (the "Retainer"), Sunrise was to be paid as follows:

   a. 10% of any commitments to purchase Inveshare's Securities ("Commitment Fees"), with such payment made upon funding, minus the amount of the Retainer; *and*

   b. Warrants to purchase the number of shares of Securities representing 10% of any amount committed by any purchaser of Inveshare's securities ("Warrants"), which have a seven-year term from their issuance, and which have a strike price of the per-share-price paid by the initial purchase of Inveshare's securities.

*See* Doc. No. 162 at §5.

5. Upon the execution of the Agreement, Sunrise began modifying and improving Inveshare's pitch materials for the purpose of "road shows" during which Inveshare would pitch itself to prospective investors. Doc. No. 161 at 58:3-59:17; Doc No. 221 at ¶9. Sunrise also mined its extensive database for potential investors believed to be suitable for Inveshare, culled those that Inveshare had identified for Sunrise at the outset, and began "an exhaustive campaign of emails, phone calls and meetings" on Inveshare's behalf. *Id*., at ¶8.

6. Sunrise did everything that was asked of it by Inveshare[1] and its sole goal was to secure financing pursuant to the Agreement—indeed, that was the only way Sunrise would get paid anything beyond the initial Retainer. *Id*. at ¶10.

7. One of the potential investors that Sunrise contacted on Inveshare's behalf was Continental Stock Transfer (CST), whose CEO identified Computershare as a potential investor in Inveshare. Doc. No. 221 at ¶11. As Low learned about Computershare's business, he came to realize that it would be an ideal investor and business partner for Inveshare, *Id*., ¶12.

---

[1] Inveshare has never disputed this point: Mr. Gilo testified that Sunrise never refused to facilitate an introduction or contact an investor (Doc. No. 161, 48:4-7), never refused or failed to communicate with potential investors (*id*. 49:12-19), never failed to assist with due diligence (*id*. 50:5-13), and always provided comments and feedback on documents as was expected of it. *Id*. 50:14-51:15; 43:6-44:7.

2

8. On November 7, 2011, Sunrise's Low emailed Inveshare's Gilo that CST "wants to meet you and[] bring along the head of compushare[sic]." Doc. No. 175. Gilo then forwarded that email to Harold Westervelt, Inveshare's President, who immediately responded "These sound like some great meetings. I think these guys can help beyond just money." Doc. No. 229. When Sunrise's Nathan Low found out that Computershare's Executive Vice President was flying into New York to meet Inveshare, he emailed Gilo: "He is flying in for you- I guess they are very interested. I think we should go for this." Doc. No. 224.

9. On November 22, 2011, Sunrise's Low and Inveshare's Gilo and Westervelt met with representatives of Computershare in Sunrise's New York office. Doc No. 221 at ¶13. According to Computershare's Paul Conn, Computershare's potential investment in Inveshare "was discussed at the meeting." Doc. No. 193 at 103:16-23.

10. During the course of the parties' subsequent discussions, Conn found Low to be "very focused, very deliberate, and… quite aggressive" in pursuing investment on Inveshare's behalf and "looking after [its] best interests." *Id.*, at 119:5-20. During this period, Conn communicated solely with Sunrise acting as the "go-between" and it was Sunrise that "was the one bringing the conversation to [Inveshare]." *Id.*, 137:12-24, 138:10-17, 150:14-151:9. At the same time, Low was also regularly updating Gilo as to his ongoing discussions with Computershare (Doc. No. 221, at ¶14; Doc. No. 162 at 144:14-24), and Gilo testified that he supported these efforts by Sunrise to engage with Computershare in fund-raising activity." *Id.* at 143:20-144:24.

11. On December 8, 2011, Conn told Low that Computershare would pass on investing, which information Low relayed to Gilo. Doc. No. 177; Doc. No. 221 at ¶15. Nevertheless, Low continued to lobby Computershare on Inveshare's behalf, sending it further information to procure an investment. *Id.* ¶16. Despite Computershare's stated lack of interest in Inveshare at the time,

3

Low nonetheless believed—and stated as much to Gilo—that Computershare would eventually "roll around" to investing in Inveshare. Doc No. 181; Doc. No. 221, at ¶17.

12. In January 2012, Low and Gilo agreed via email to modify the terms of the Agreement such that Sunrise would no longer act as an exclusive placement agent, but would retain such exclusivity with respect to any accounts that Sunrise had already brought to Inveshare's attention. *See* Doc Nos. 183, 184, 185 and 188; *see also* Doc. No. 221 at ¶¶ 21-24. These emails reflect the Parties' understanding that it was in everyone's interest for Sunrise to continue to identify potential investors, even as Inveshare retained other placement agents. *Id*., ¶¶26-28.

13. On March 22, 2012, Inveshare sent Low an update on its investment prospects, requesting further assistance in raising capital, and asking to meet with potential investors the following week. Doc. No. 225.

14. On May 7, Inveshare's Chief Compliance Officer sent an email to Computershare to update it as to the progress Inveshare was making with respect to its business development, touting specific client relationships that Inveshare was developing, and inquiring if those updates "would warrant [] reopening the investment discussion." Doc No. 168. No one sent this email, or reported that new information, to anyone at Sunrise, which had no idea Inveshare was attempting to "reopen investment discussions" with Computershare. Doc No. 221, at ¶33.

15. Then, on November 8, Westervelt—acting at Gilo's instruction to re-approach Computershare—contacted Computershare's Conn, again without Sunrise's knowledge or participation. Doc. No. 165 at CPU0276; Doc. No. 161, at 188:5-16.

16. Westervelt reminded Conn: "Its been a while since we last spoke, in fact it has been almost a year since we met in Nathan Low[]'s office. Last year we discussed having Computershare invest in Inveshare…" Doc. No. 165. Westervelt then proceeded to update Conn

on the progress Inveshare had made since, noting its new partnerships, new clients, and other reasons why Inveshare "could [now] provide Computershare with an excellent avenue for participation in the $1.8b shareholder communications market." *Id.*

17. Like the May 7 email, no one from Sunrise was included on—or apprised of—this November 8 communication. Conn sent this email along to his colleagues at Computershare, along with the pitch materials that he had received the year prior from Sunrise. *Id.*, at CPU0275.

18. There is no dispute that this email then led to Computershare's eventual investment in Inveshare. Doc. No. 161, 186:23-187:4, 188:23-25. After months of negotiations, on April 15, 2013, Computershare announced a "strategic partnership" whereby it would "acquire approximately 25% of Inveshare" for $10 million. *Id.*, 189:2-17; Doc. No. 186.

19. Sunrise found out about this investment only when it was publicly announced. Doc. No. 221, at ¶35. Sunrise subsequently learned that that its client, Randall Winn, had also invested $250,000 in Inveshare. *See* Doc. No. 221 at 36¶, *citing* Ex. G to Doc. No. 213. Again, no one from Inveshare informed Sunrise of this investment. Doc. No. 221 at 36¶.

20. On May 8, 2013, pursuant to the terms of the Agreement excerpted above, Low sent Gilo an invoice seeking (a) $1 million on account of the $10 million Computershare investment, and (b) $25,000 on account of the $250,000 invested by Randall Winn. Doc. No. 226.

21. In May 2014, Computershare invested another $10 million in Inveshare. Doc No. 193 at 199:3-200:3; Doc. No. 161 at 190:4-22.

## PROCEDURAL BACKGROUND

22. Inveshare moved to dismiss Sunrise's complaint (Doc. Nos. 26-37), which motion was denied. Doc. No. 49.

23. At the close of discovery, Inveshare moved to amend its Answer to add a Counterclaim (Doc Nos. 73-84), which motion was also denied. Doc. No. 111.

24. A Note of Issue was filed on September 28, 2018 (Doc. No. 136), after which Inveshare moved for summary judgment. Doc. Nos. 158-220. After argument before the Court, that motion was denied on April 2, 2019. Doc. No. 243.

25. The parties then submitted pre-trial submissions on October 11, 2019 (Doc. No. 249-255), and the Court held a pre-trial conference on October 30, 2019 at which the Court set a March 16, 2020 trial date.

26. On January 21, 2020, Morrison Cohen LLP filed an order to show cause to withdraw as Inveshare's counsel (Doc. No. 261-266) due to (i) Inveshare's failure to pay its legal bills and (ii) Davidi Gilo's cessation of all communication with his counsel. Indeed, Morrison Cohen LLP submitted communications from Mr. Gilo indicating that he would be spending the first months of 2020 sailing on the Pacific Ocean and inaccessible. Doc. No. 265.

27. On February 3, 2020, the Court granted Morrison Cohen's motion to withdraw and stayed the action through February 20, 2020, at which time Inveshare was to appear for a telephonic conference via replacement counsel. Doc. No. 270. No such counsel ever appeared in this action, and no one attended the February 20 conference on Inveshare's behalf.

28. On February 21, 2020, the Court entered an order (i) holding Inveshare in default, (ii) striking its answer, (iii) canceling the trial set for March 16, 2020; and (iv) authorizing Sunrise to move for a default judgment against Inveshare. Doc. No. 273.

29. This Motion follows.

## SUNRISE IS ENTITLED TO A DEFAULT JUDGMENT UNDER CPLR 3215

30. Pursuant to CPLR §3215(a), when "a defendant has failed to… proceed to trial of an action reached and called for trial, or when the court orders a dismissal for any other neglect to proceed, the plaintiff may seek a default judgment against [defendant]."

31. As discussed above, Inveshare has failed to appear for trial pursuant to the Court's directives, and Mr. Gilo has ignored his counsel's communications and the Court's orders while he sails in the Pacific. The Court's February 21 Order expressly authorized Sunrise to seek this default judgment.

32. Here, default judgment is particularly appropriate in light of Inveshare's active participation in this litigation: over the course of three years it filed motions to dismiss, compel, amend, and for summary judgment. Now, having lost all of those motions, it has disappeared on the eve of trial and withdrawn itself entirely from this action. Under these circumstances, its refusal to "proceed to trial" warrants the entry of default judgment against it.

## SUNRISE'S DAMAGES

33. The Court has full discretion to assess proof of damages submitted by Sunrise, so long as the resulting judgment does "not exceed in amount or differ in type from that demanded in the complaint." N.Y. C.P.L.R. §3215(b).

34. The Complaint sought, among other things, Commitment Fees amounting to 10% of the amounts paid by Computershare for Inveshare's Securities, as well as Warrants exercisable by Sunrise at whatever purchase price Computershare had paid for the Securities in question. *See* Complaint, Doc. No. 1 at ¶¶ 8-9.

35. The Complaint alleged that in April 2013, Computershare acquired a 25% interest in Inveshare for $10 million, at $2.052/share, that one year later it bought another 15% of Inveshare for another $10 million, and that Randall Winn bought 159,011 shares of Inveshare for $250,000, at $1.5722 per share. *See* Complaint, Doc. No. 1, at ¶¶18, 23, 15.

36. Discovery in this action has only confirmed these allegations.

*Commitment Fees*

37. With respect to Computershare, Inveshare owes Commitment Fees equal to 10% of the amounts paid for Inveshare's Securities, and the evidence confirms that Computershare paid $10 million for such Securities on April 15, 2013. *See* Doc No. 186 (April 15, 2013 announcement of a "strategic partnership" whereby Computershare would "acquire approximately 25% of Inveshare," which announcement was submitted by Inveshare in support of its motion for summary judgment); *see also* Doc. No. 160 at 189:2-13 (Gilo testifies that Computershare paid $10 million for its April 2013 investment); Doc. No. 193 at 197:19-198:24 (Conn testifies that in April 2013, Computershare "invested capital" totaling $10 million for "a 25 percent stake in the company.").

38. The evidence further confirms that Computershare subsequently invested another $10 million in June 2014 to increase its stake in Inveshare to 40%. *See* Doc No. 6, at Ex. E (Computershare's 2014 Annual Report: "An increased investment (from 25% to 40%) [] was made in June 2014."); *see also* Doc. No. 193 at 199:3-200:3 (Conn testifies to a subsequent $10 million investment for increased equity position to 40 percent); Doc. No. 161 at 198:24-199:22 (Gilo testified that Computershare invested "another $10 million the following year").

39. As for Randall Winn, Inveshare owes Commitment Fees equal to 10% of the amounts he paid for Inveshare's Securities. Records show that Winn bought 159,011 shares at a

8

price of $250,000. *See* Doc. No. 6, at Ex. G. Sunrise is therefore owed another $25,000 in Commitment Fees based on this investment.

40. As such, Sunrise is owed **$2.025 million** in Commitment Fees on account of Computershare's $20 million investment and Winn's $250,000 investment in Inveshare.

*Warrants*

41. Under the Agreement, Sunrise is entitled to Warrants enabling it to purchase shares equal to ten percent of the shares purchased by Computershare and Winn.

42. Computershare purchased $20 million worth of shares at $2.052052/share. *See* Doc. No. 6, at Ex. D (¶1, disclosing the $10 million investment at $2.052052/share in April 2013) and at Ex. F (p. 1, disclosing an additional $10 million investment in 2014 at the same valuation as the April 2013 investment).

43. As for Mr. Winn, he purchased $250,000 worth of shares at $1.5722/share. *See* Doc. No. 6, at Ex. G.

44. In September 2016, Inveshare sold itself to Broadridge Investor Communications for $95 million, at which time shareholders received $2.66/share. *See* Doc. No. 6, at Ex. I. Had Sunrise received the Warrants due to it under the Agreement, they would have been automatically exercised upon Inveshare's sale to Broadridge, which redeemed such shares at $2.66 per share.

45. Sunrise's damages with respect to the Warrants constitute the difference between the stock price as redeemed in September 2016 (at $2.66), and the price initially paid by Computershare ($2.052052) and Winn ($1.5722) for their respective $20 million and $250,000 investments, totaling **$609,824.**

*Prejudgment Interest*

46. "Interest shall be recovered upon a sum awarded because of a breach of performance of a contract." CPLR §5001(a). Such interest is to be "computed from the earliest ascertainable date the cause of action existed, except that interest upon damages incurred thereafter shall be computed from the date incurred." *Id*. at §5001(b); *Bldg. Serv. Local 32B-J Pension Fund v. 101 Ltd. P'ship*, 148 A.D.3d 594, 595 (1st Dep't. 2017) (interest to be computed from the date on which the damages were incurred). New York's statutory rate of 9% per annum should be applied as the default rate. *See NML Capital v. Republic of Argentina*, 17 N.Y.3d 250, 258, 952 N.E.2d 482, 488 (2011).

47. Here, at set forth above, Inveshare first breached the Agreement when it was presented an invoice on May 8, 2013, but refused to pay Commitment Fees on account of Winn's investment and Computershare's initial investment. Interest should be calculated at 9% per annum from May 8, 2013, to the date of judgment with respect to $1.025 million in Commitment Fees.

48. Inveshare further breached the Agreement as of June 30, 2014 (at latest), when it failed to pay Commitment Fees on account of the second Computershare investment of $10 million that month. Interest should be calculated at 9% per annum from June 30, 2014, to the date of judgment with respect to the subsequent $1 million in Commitment Fees.

49. With respect to the $609,824 in damages on account of the Warrants that were never provided to Sunrise, interest should be calculated at 9% per annum from September 22, 2016, the date by which Inveshare shareholders' stock redemption agreements were due to the company upon its sale to Broadridge for $2.66/share. *See* Doc No. 6, Ex. I.

*Legal Fees and Expenses*

50. The Agreement includes an annexed Indemnification Agreement which provides that Inveshare shall indemnify Sunrise for all legal costs, expenses and disbursements incurred relating to the Agreement, including "any breach by [Inveshare] of any representation, warranty, covenant or agreement contained in the [] Agreement…. or the enforcement by Sunrise of its rights under the [] Agreement." Sunrise should be awarded its legal fees and expenses incurred in enforcing the terms of the Agreement via this action.

## **CONCLUSION**

For the reasons set forth above, Sunrise respectfully asks the Court to enter judgment against Inveshare in the amount of (i) $2.025 million in Commitment Fees; (ii) $609,824 in Warrants; (iii) prejudgment interest at 9% per annum; (iv) its legal fees and expenses; and (v) any other relief the Court deems just and proper.

Dated: New York, New York
       May 27, 2020

                                                */s/ Noam Besdin*
                                                Noam Besdin