UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SSC NY CORP., formerly known as Sunrise Securities,<br><br>      Plaintiff,<br><br>v.<br><br>COMPUTERSHARE INC.,<br>DAVIDI GILO,<br>RENATA RISTOVA-GILO and<br>GILO VENTURES LLC,<br>      Defendants. | 21-cv-9709 (JPO)<br><br>**AMENDED COMPLAINT** |

  Plaintiff SSC NY Corp. f/k/a Sunrise Securities Corp. ("Sunrise"), as and for its amended complaint against Defendants Computershare Inc. ("Computershare"), Davidi Gilo, Renata Ristova-Gilo and Gilo Ventures LLC, hereby alleges:

## NATURE OF ACTION

  1. Non-party Blockchain Technologies Innovation Inc. (a/k/a Iveshare Inc.) ("Iveshare") is a Delaware corporation whose sole office was located in Alpharetta, Georgia. Prior to its wind-down and liquidation (discussed below), Iveshare was a technology company that provided shareholder communications services within the United States.

  2. Sunrise is a judgment creditor of Iveshare and is owed over $4 million on account of its judgment all of which is unpaid.

  3. The judgment was entered on a cause of action for breach of contract; specifically, a placement agreement they had entered into in 2011.

  4. On September 16, 2016, Iveshare closed on the sale of its technology assets to non-party Broadridge Financial Solutions Inc. ("Broadridge") in exchange for $90 million.

  5. Davidi Gilo, Iveshare's Director and CEO, attested that over the next two weeks, Iveshare redeemed all of its shareholders' equity interests, except for those held by him; and immediately distributed an agreed amount of the sale proceeds to them.

6. Computershare, the 40% owner of equity interests in Inveshare, received $33.1 million on September 16, 2016, in satisfaction of approximately $7.2 million in loan obligations and its equity interests. Per its annual report, Computershare booked a post-tax gain of $9.3 million from the transaction.

7. Davidi Gilo and his wife Renata Ristova-Gilo also received $1.7 million on said date as well.

8. After making the redemption payments in September 2016, Inveshare wound down its business. Its authorization to conduct business in the only state where it did business (Georgia) was voluntarily withdrawn effective March 2, 2018, on application of the company representing it no longer did business in the state. That same month Inveshare closed two of its five bank accounts. The other three reflected no subsequent meaningful business activity and were closed by May 2019.

9. During the course of the wind-down, Davidi Gilo caused Inveshare to pay millions of dollars to himself and to Gilo Ventures LLC, and an additional $105,503 to his wife.

10. This is an action to recover the payments made to the Defendants, from and after September 16, 2016, to the extent of the amount of said payments, up to the amount of Sunrise's judgment (inclusive of post-judgment interest), and attorneys' fees incurred herein.

## THE PARTIES

11. Sunrise is a New York corporation, whose principal office is located at 152 West 57th Street, 19th Floor, New York, New York 10019.

12. Computershare is a Delaware corporation, whose principal office is located at 150 Royall Street, Canton, Massachusetts 02021.

13. Davidi Gilo was the Director and CEO of Inveshare and is the trustee of the GV II LP Liquidating Trust. At his deposition in the underlying litigation with Sunrise, he stated that his

mailing address in the United States was 5753 Highway 85 North, #4373 in Crestview, Florida. That is the same mailing address for Gilo Ventures LLC listed with the Florida Division of Corporations, whose corporate status is listed as "active." Internet postings by Davidi Gilo indicate that he resides in Amsterdam in the Netherlands; and on information and belief he is domiciled there.

14. Renata Ristova-Gilo is Davidi Gilo's wife. Upon information and belief she is also domiciled in Amsterdam.

15. Gilo Ventures LLC is a Florida limited liability corporation. Its 2021 Florida LLC Annual Report lists Davidi Gilo as its sole member. Upon information and belief, he is its sole manager as well.

## BACKGROUND

I. **COMPUTERSHARE'S RELATIONSHIP WITH INVESHARE**

16. Sunrise is a FINRA-registered broker dealer and boutique investment bank that specializes in equity financings.

17. On November 3, 2011, Sunrise and Inveshare entered into a placement agreement, pursuant to which Inveshare agreed to pay Sunrise fees if Inveshare issued securities to purchasers introduced by Sunrise.

18. In connection with that agreement, Sunrise introduced Computershare to Inveshare as a potential investor.

19. Sunrise arranged for Computershare's CEO to meet with Davidi Gilo, the CEO of Inveshare in Sunrise's New York City office.

20. In its answer to the complaint in the underlying litigation, Inveshare admitted the same. Similarly, Computershare's director Paul Conn also stated at his deposition that Sunrise's principal Nathan Low operated as a "go-between" between Computershare and Inveshare.

21. On April 12, 2013, Computershare entered into to a Stock Purchase Agreement with Inveshare, pursuant to which it acquired 25% of the equity interests in Inveshare in exchange for $10 million.

22. On May 8, 2013, following the closing of that transaction, Sunrise emailed its invoice for its commission in respect of the same to Davidi Gilo.

23. The same day, Davidi Gilo acknowledged receipt of the invoice but disputed liability by email.

24. Computershare entered into a second Stock Purchase Agreement with Inveshare, dated May 30, 2014, pursuant to which it acquired an additional 15% of the equity interests in Inveshare in exchange for $10 million.

25. Inveshare had a five-member board. After Computershare obtained its equity interests, Computershare appointed Steven Rothbloom, its President, and Paul Conn, its President, Global Capital Markets, to the board.

26. Messrs. Rothbloom and Conn had also signed the first and second Stock Purchase Agreements, respectively, on behalf of Computershare.

27. Pursuant to the second Stock Purchase Agreement, Inveshare's bylaws were amended to give Computershare the right to designate a "Private Label Operations Officer" of Inveshare who, absent the occurrence of an "Operational Trigger", may attend any "meetings of the senior operations managers of [Inveshare, and receive] all matters provided to such managers." Under the bylaws, upon the occurrence of an "Operational Trigger" such officer would "have full authority to direct the operations of Inveshare", including the right "to (i) deploy employees of Computershare 'on site' at the corporation's offices, (ii) provide direction to the corporation's employees and third party vendors and (iii) make such changes to the manner in which the corporation's business is operated to rectify the problem causing the Operational Trigger …" and

the right to "override the operational decisions of all officers and senior managers of the corporation" including the CEO, President and COO.  Inveshare's charter was also amended to prohibit the removal or modification of this provision, or the removal of the Private Label Operations Officer.

28. In its 2016 annual report, Computershare stated Inveshare had incurred $7.2 million in loan obligations to Computershare and described the obligations as "Loans to associates."

## II. THE BROADRIDGE TRANSACTION AND RESULTING REDEMPTION PAYMENTS

29. On September 16, 2016, Broadridge announced that it had acquired the technology assets of Inveshare in exchange for $90 million.

30. Inveshare structured the Broadridge transaction such that the redemption transactions described herein would immediately follow its closing.  That is, Inveshare devised that the Broadridge transaction would be consummated, publicized and its proceeds distributed before creditors of Inveshare would have an opportunity to object.

31. In connection with the Broadridge transaction, Inveshare offered each of its shareholders the opportunity to redeem its shares in Inveshare at a stated price.

32. Such offer necessarily would have required the approval of Inveshare's board, which at the time was controlled by Computershare and Davidi Gilo.

33. All shareholders elected to redeem, excluding Davidi Gilo who attested his shares were exempt from the redemption.

34. The redemption was completed in its entirety by September 30, 2016.

35. In connection with the redemption Inveshare made five payments to Computershare totaling $33.1 million on September 16, 2016.

36. The payments to Computershare were applied to its outstanding loan balance, and payments in excess thereof were booked as gains from the disposition of the equity interests.

Computershare stated in its 2017 annual report, that "Inveshare Inc. was disposed during the reporting period. A post-tax gain of $9.3 million was recorded on the disposal."

### III. INVESHARE'S SUBSEQUENT WIND-DOWN AND LIQUIDATION

37. Pursuant to Inveshare's agreement with Broadridge, Broadridge agreed to make a deferred payment of $40 million on delivery of certain blockchain applications.

38. However, Inveshare made no attempt to develop the blockchain applications called for under the agreement and instead wound down its business.

39. The Georgia Secretary of State issued a Certificate of Withdrawal, revoking Inveshare's authority to do business in state, effective March 2, 2018, on Inveshare's application representing that it no longer transacted business in Georgia. Its status with the State of Delaware is "Void."

40. Inveshare closed two of its four SunTrust Bank accounts in March 2018, its sole Bank of America account in October 2018 and the other two SunTrust Bank accounts in May 2019. Upon information and belief, it had no other bank accounts.

41. Inveshare had no meaningful business after September 2016. Its bank statements reflect that between October 2016 and March 2018, it received total business income of $434,598.44 ($24,144.36/month for the period), a pittance for a company whose monthly payroll was around $300,000/month in September 2016 (and before).

42. Inveshare stopped funding payroll after December 2017, and dramatically reduced monthly payroll funding during the period October 2016-December 2017.

43. Inveshare's bank statements reflect that it received less than $200 in business income between April 2018, the month after it closed the first of its bank accounts, and May 2019, when the last of its bank accounts was closed.

### IV.   THE UNDERLYING LITIGATION

44. As discussed above, the Broadridge transaction was publicly announced on Friday, September 16, 2016.

45. Despite knowledge of Sunrise's claim under the placement agreement, Inveshare's board of directors approved the redemption payments including those made to Computershare.

46. On September 22, 2016, Sunrise commenced the underlying litigation against Inveshare to recover amounts owed under the placement agreement, in New York County Supreme Court.

47. On March 23, 2017, the state court denied Inveshare's motion to dismiss.

48. On August 30, 2018, Sunrise filed a note of issue and certificate of trial readiness.

49. On April 4, 2019, the state court denied Inveshare's motion for summary judgment.

50. On January 17, 2020, Inveshare's counsel moved to withdraw for refusal to communicate and failure to pay $68,111 in attorneys' fees.

51. On February 3, 2020, the state court permitted counsel's withdrawal and warned judgment would be entered absent entry of an appearance by substitute counsel. No substitute counsel appeared; and so, on June 15, 2020, the state court held Inveshare to be in default and directed that judgment be entered in favor of Sunrise.

52. On July 27, 2020, judgment was entered in favor of Sunrise and against Inveshare in the amount of $3,961,587.25. To date, no portion of the judgment has been paid.

### V.   TRANSFERS MADE BY INVESHARE TO GILO VENTURES LLC, DAVIDI GILO AND RENATA RISTOVA-GILO

53. Notwithstanding Davidi Gilo having attested in the underlying litigation that his shares in Inveshare were excluded from the redemption transaction, Inveshare's bank statements reflect that on September 16, 2016, Inveshare made (a) two payments totaling $1.7 million to a joint account of Davidi Gilo and Renata Ristova-Gilo (Wells Fargo -4765), and (b) fourteen

payments totaling $10 million to Gilo Ventures II, LP, a Delaware limited partnership owned and managed by Davidi Gilo.

54. In addition, on October 19, 2016 and October 24, 2016, after the commencement of the underlying litigation, Inveshare made two payments totaling $19,429 to the same joint account.

55. On January 4, 2017, Gilo Ventures II, LP wired $315,629 to Davidi Gilo.

56. Gilo Ventures II, LP also made the following payments to Gilo Ventures LLC: $486,000 paid on March 9, 2017, $58,500 paid on March 14, 2017, $1.25 million paid on July 10, 2017, $1.5 million paid on September 5, 2017, $250,000 paid on September 12, 2017 and $13,427 paid on August 16, 2017 ($3,557,927 total).

57. Gilo Ventures II, LP also paid $105,503 directly to Renata Ristova-Gilo on August 20, 2017 (Rabobank Nederland -6251), despite her never having worked for or invested funds with Gilo Ventures II, LP or Inveshare.

58. Gilo Ventures II, LP's status with the State of Delaware is "Voluntarily Cancelled" as of April 9, 2018.

59. Gilo Ventures II, LP closed its bank accounts in August 2018, but before doing so paid $804,813 by check to GV II LP Liquidating Trust, of which Davidi Gilo is the trustee.

60. In addition, of the $90 million purchase price paid by Broadridge, $35 million was held back and transferred to another of Inveshare's bank accounts (SunTrust -7972).

61. Of that $35 million, $5 million was transferred to another of Inveshare's bank accounts (SunTrust -6221) on September 22, 2016, and wired to Davidi Gilo immediately on receipt; $2.5 million was transferred to the same bank account on September 26, 2016 and wired to Davidi Gilo immediately on receipt; $2.5 million was transferred to the same bank account on September 27, 2016 and wired to Davidi Gilo immediately on receipt; and $13 million was

transferred to the same bank account on October 17, 2016, of which $11,435,000 was wired to Davidi Gilo immediately on receipt. The latter three of these payments were made after the commencement of the underlying litigation.

62. Of the balance of the above-referenced $35 million, at least $6 million was returned to the Inveshare bank account to which the purchase price was paid (Bank of America -9541) on various dates between November 2016 and August 2018, and then remitted to or for the benefit of Davidi Gilo outside of payroll.

**FIRST CAUSE OF ACTION**
**Actual Fraudulent Conveyance**
**(Against all Defendants)**

63. Sunrise repeats and realleges Paragraphs 1-62 as if fully set forth and incorporated herein.

64. The above-described payments to the Defendants herein were made with actual intent to hinder, delay or defraud Inveshare's creditors, including Sunrise.

65. Inveshare intended to hinder, delay and defraud its creditors because it intended to sell substantially all of its assets to Broadridge, immediately distribute the proceeds to holders of its equity interests or their insiders, and otherwise wind-down the company without paying Sunrise.

66. Multiple badges of fraud are present, as to such payments.

67. <u>Close Relationship</u>. Computershare was Inveshare's 40% shareholder, appointed two of its directors and had additional management and governance rights. Indeed, Computershare is an acknowledged affiliate ("associate") of Inveshare and is appropriately considered an insider of Inveshare. Each of Davidi Gilo, his affiliate Gilo Ventures LLC and his wife are naturally also insiders.

68. <u>Transfers Not in the Usual Course of Business</u>.  The subject payments made to Computershare were redemption payments made on account of its 40% equity interests, made at a time when Davidi Gilo attested that Inveshare was redeeming all equity interests in Inveshare other than those held by him.  Redemption payments are necessarily not made in the ordinary course of business.  The subject payments made to the other Defendants were either made at the same time, or while Inveshare was winding down and liquidating; and so are likewise not made in the ordinary course of business.

69. <u>Inadequacy of Consideration</u>.  The payments made to Computershare far exceeded the amount of Inveshare's loan obligations to it.  The payments made to each other Defendant were made without any consideration.

70. <u>Transferor's Knowledge of Creditor's Claim</u>.  Inveshare knew of Sunrise's claim at the time the subject payments were made, Sunrise having invoiced Davidi Gilo for placement fees on May 8, 2013, and commenced the underlying litigation against Inveshare on September 22, 2016.

71. <u>Complete Liquidation Prior to Abandonment of Defense of Sunrise Litigation</u>.  Inveshare had no meaningful business activity after the September 2016 transaction with Broadridge closed, wound down its business and represented to the only state in which it did business (Georgia) that it was not doing business in the state as of March 2018.  Inveshare did not abandon its defense of the underlying litigation until late 2019, at the earliest, after Inveshare's motion for summary judgment was denied in April 2019, by which point its liquidation had been completed.

72. The existence of several badges of fraud constitutes clear and convincing evidence, that at the time the subject payments were made, Inveshare had actual intent to defraud its creditors, as a matter of law.

73. The above-identified payments made by Inveshare to each Defendant were accordingly fraudulent as to Sunrise, under Debtor and Creditor Law § 276.

74. Judgment should be entered against: (a) each of Davidi Gilo and Computershare in the amount of Sunrise's judgment against Inveshare (inclusive of post-judgment interest), (b) Gilo Ventures LLC in the amount of $3,557,927 and (c) Renata Ristova-Gilo in the amount of $1,805,503; in each case plus attorneys' fees pursuant to Debtor and Creditor Law § 276-a, costs and prejudgment interest.

### SECOND CAUSE OF ACTION
### Constructive Fraudulent Conveyance
### (Against all Defendants)

75. Sunrise repeats and realleges Paragraphs 1-74 as if fully set forth and incorporated herein.

76. The above-described payments made to each Defendant, were made without receiving fair equivalent value in consideration therefor.

77. As transfers to insiders, said payments were also made without good faith as a matter of law.

78. Said payments were made with the subjective intent or belief that Inveshare would fully liquidate before Sunrise could litigate its claim to judgment, thus ensuring that Sunrise would be unable to enforce the same as against Inveshare; and in fact, Inveshare did abandon the underlying litigation after its liquidation was complete.

79. The above-described payments made to each Defendant were accordingly fraudulent as to Sunrise, under Debtor Creditor Law § 275.

80. Judgment should be entered against: (a) each of Davidi Gilo and Computershare in the amount of Sunrise's judgment against Inveshare (inclusive of post-judgment interest), (b) Gilo

Ventures LLC in the amount of $3,557,927 and (c) Renata Ristova-Gilo in the amount of $1,805,503; in each case plus costs and prejudgment interest.

WHEREFORE, judgment should be entered against: (a) Computershare and Davidi Gilo in the amount of Sunrise's judgment against Inveshare (inclusive of post-judgment interest), (b) Gilo Ventures LLC in the amount of $3,557,927 and (c) Renata Ristova-Gilo in the amount of $1,805,503; in each case plus attorneys' fees pursuant to Debtor and Creditor Law § 276-a, costs and prejudgment interest; and Sunrise should be granted such other and further relief as the Court deems just and proper.

Dated: New York, New York
       January 14, 2022

AMINI LLC

/s/ Jeffrey Chubak
Lita Beth Wright
Jeffrey Chubak
131 West 35th Street, 12th Floor
New York, New York 10001
(212) 490-4700
*Attorneys for Plaintiff*